378 So.2d 677 (1979)
Nina MIGLIONICO et al.
v.
The BIRMINGHAM NEWS COMPANY.
The BIRMINGHAM NEWS COMPANY
v.
Nina MIGLIONICO et al.
CITY OF BIRMIGNHAM et al.
v.
The BIRMINGHAM NEWS COMPANY.
78-59, 78-59X and 78-62.
Supreme Court of Alabama.
September 14, 1979.
As Corrected on Denial of Rehearing December 7, 1979.
*678 John S. Foster, Birmingham, for appellants and cross-appellees Nina Miglionico, David Herring, Russell Yarbrough, E. C. Overton, Richard Arrington, Jr., and Bessie S. Estell.
John P. Carlton and Charles E. Clark, Birmingham, for appellants City of Birmingham and David Vann, Mayor.
James C. Barton and Gilbert E. Johnston, Jr., Birmingham, for appellee and cross-appellant Birmingham News Co.
David M. Olive of McMillan & Spratling, Birmingham, for Birmingham Post Co., Inc. and Alabama Press Ass'n, amicus curiae.
BLOODWORTH, Justice.
These are consolidated appeals and a cross-appeal from a final judgment enjoining the members of the Birmingham City Council from excluding any of the public from its meetings and from meeting in secret or executive sessions except when the character or good name of a person is involved. We affirm in part, reverse in part, and remand for entry of a judgment in conformity herewith.
On March 20, 1978, two employees of The Birmingham News (News) were denied admission to a closed meeting of the Birmingham City Council (Council) held to consider an appointment to the city board of education. At that meeting, the Council interviewed potential appointees and the members indicated their preferences by marking sheets of paper.
Another closed meeting of the Council was scheduled for April 17, 1978, to consider an appointment to fill a vacancy on the Council itself. This meeting was cancelled following a court order obtained by the News requiring the meeting to be open to the public.
The News then sought a permanent injunction requiring all meetings of the Council to be open to the public. Six of the eight Council members named as defendants appeared, and the City of Birmingham and the Mayor were allowed to intervene as defendants.
After a hearing ore tenus, the trial court found that the News was entitled to the relief sought. The final judgment reads, in pertinent part, as follows:

"ONE: The Defendants are hereby enjoined to cease and refrain from excluding any of the public from any of its meetings and from meeting in secret or executive sessions except, `when the character or good name of a woman or man is involved' in the matters considered and discussed."
Following denial of motions for a new trial or, in the alternative, to modify the final judgment, the Council and the intervenors appealed, and the News cross-appealed from the judgment insofar as it permits closed meetings under some circumstances.
Three statutes are involved, referred to hereafter as "sunshine laws." The first is Code 1975, § 13-5-1, enacted in 1915. It prohibits executive or secret sessions of various boards or commissions, including any city commissions or municipal councils, except when the character or good name of a person is involved:
"§ 13-5-1. Executive or secret sessions of certain boards.
"No executive or secret session shall be held by any of the following named *679 boards, commissions or courts of Alabama, namely: Alabama public service commission; school commissions of Alabama; board of adjustment; state or county tax commissions; any county commission, any city commission or municipal council; or any other body, board or commission in the state charged with the duty of disbursing any funds belonging to the state, county or municipality, or board, body or commission to which is delegated any legislative or judicial function; except, that executive or secret sessions may be held by any of the above named boards or commissions when the character or good name of a woman or man is involved.
"Any person or persons violating any of the provisions of this section shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than $10.00 nor more than $500.00. Any person who remains in attendance upon any meeting of any of the above named boards or bodies which is being held in secret or executive session shall be deemed guilty of violating the provisions of this section. (Acts 1915, No. 278, p. 314; Code 1923, §§ 5254, 5255; Code 1940, T. 14, §§ 393, 394.)"
The second statute is Code 1975, § 11-43-49, which first appeared in the 1907 Code. This statute applies to mayor-council forms of municipal government in general, and requires all council meetings to be open to the public:
"§ 11-43-49. Same Time and place of meetings generally; appointment of temporary chairman or election of president pro tempore.

"The council shall determine the time and place of holding its meetings, which at all times shall be open to the public, and, in towns and cities of less than 12,000 population, in the absence of the mayor, shall appoint a temporary chairman, which appointment shall be entered of record. In cities of more than 12,000 population, it shall elect viva voce a president pro tempore. (Code 1907, § 1192; Code 1923, § 1908; Code 1940, T. 37, § 429; Acts 1961, No. 666, p. 910, § 4.)"
The third statute is the Mayor-Council Act of 1955,[1] as amended, which applies to the City of Birmingham. The Act provides that all meetings of the council shall be open to the public, that the council exercises its powers subject to the Constitution and laws of Alabama, and that only those laws inconsistent with the provisions of the Act are superseded. There is no provision for executive or secret sessions. Pertinent sections of the Act are:
"2.02. Form of Government. The municipal government of any such city proceeding under this Act shall be known as the `mayor-council form of government.' Pursuant to the provisions and limitations of this Act and subject to the limitations imposed by the Constitution of Alabama and its laws, all powers of the city shall be vested in the council elected as herein provided and hereinafter referred to as `the council,' which shall enact ordinances, adopt budgets and determine policies. All powers of the city shall be exercised in the manner prescribed by this Act, or if the manner be not prescribed, then in such manner as may be prescribed by law or by ordinance."
"3.12. Induction of council into office; meetings of council. The first meeting of each newly elected council for induction into office, shall be held at ten o'clock in the morning on the second Tuesday in November next following its election, after which the council shall meet regularly at such times as may be prescribed by its rules, but not less frequently than once a week. All meetings of the council shall be open to the public.
"10.01. Effect of this Act on existing law. (a) All laws and parts of laws, general, local or special, relating to or affecting the city, its powers, functions, duties and property, in force when this Act shall take effect, are hereby continued in effect; but all such laws relating to the exercise of powers, functions and duties by the commission or council-manager or *680 some other form of government shall be superseded to the extent that the same are inconsistent with the provisions of this Act."
It appears to us that it makes no difference with respect to the issue of "sunshine laws" whether § 11-43-49 or § 3.12 of the Mayor-Council Act applies. Neither section is inconsistent with § 13-5-1, and all three may be read in pari materia. The clear language of the open meetings laws evidences the legislative policy of this state that all meetings of municipal governing bodies are to be open to the public and that no executive sessions are to be held, with the one exception set out in § 13-5-1. It is the application of this broadly stated public policy which is at issue on this appeal.
There are challenges to the News' standing to enforce the open meetings laws. Section 11-43-49 and the Mayor-Council Act have no enforcement provisions. Section 13-5-1 provides that a violation is a misdemeanor punishable by a fine. There is reliance upon the general principle that one who has no injury different from that sustained by the general public may not maintain an action in the public interest.
We hold that the News does have standing to enforce the "sunshine laws." The public meeting requirement is for the benefit of the public to ensure that it has the opportunity to become informed as to the affairs of its governmental bodies. It is intended that the whole deliberative process be open to public scrutiny, rather than that there be the mere formal announcement of decisions already made in private. In Channel 10, Inc. v. Independent School District No. 709, 298 Minn. 306, 215 N.W.2d 814 (1974), the Supreme Court of Minnesota addressed the identical issue of standing, in that case of a television station, to enforce the Minnesota Open Meetings Law, which had no enforcement provisions. As that court concluded, so do we, that the nature of "sunshine laws" implies standing in members of the public to enforce their right to attend public meetings.
Some appellants question the propriety of injunctive relief, contending that criminal statutes may not be enforced by injunction. It is true that § 13-5-1 is codified in Title 13, Crimes and Offenses, and prescribes punishment for a violation. However, the inclusion of criminal sanctions does not necessarily make the entire statute penal in nature. In Laman v. McCord, 245 Ark. 401, 432 S.W.2d 753 (1968), the Supreme Court of Arkansas, speaking through Justice George Rose Smith, held that the Arkansas Freedom of Information Act, although it did contain criminal sanctions, is not primarily a criminal statute. Rather, it "was [enacted] wholly in the public interest and is to be liberally interpreted" most favorably to the public. Cf. Raton Public Service Co. v. Hobbes, 76 N.M. 535, 417 P.2d 32 (1966).
This Court has recognized that the criminality of an act sought to be restrained does not bar the remedy of injunction to protect public rights and public welfare. Corte v. State, 259 Ala. 536, 67 So.2d 782 (1953); Try-Me Bottling Co. v. State, 235 Ala. 207, 178 So. 231 (1938). We recently held that an injunction was proper to prevent city council members from conducting city business by letter. City Council of City of Prichard v. Cooper, 358 So.2d 440 (Ala. 1978).
From the foregoing, we conclude that an injunction is a proper remedy to enforce the open meetings laws and that the News has standing.
The Council next contends that meetings to discuss or interview prospective appointees fall within the exception allowing executive sessions "when the character or good name of a woman or man is involved."
Many states have "sunshine laws" which specifically provide that the public may be excluded when considering appointments, employment, or personnel matters.[2] Other states have statutes which take the opposite *681 approach and do not allow closed meetings for appointments.[3]
Our statute says nothing about appointments. Thus, although we hold that "character or good name" as used in § 13-5-1, does not per se include a session considering an appointment or personnel matters, "character or good name" may often be an issue in such discussions. On the other hand, discussion of "character" or "good name" may occur at other times unrelated to appointments or personnel matters.
We believe that the legislature intended by the use of the words "character" or "good name" to permit executive sessions whenever there is a discussion of one's general reputation, i. e., the estimate the public places on a person, his reputation, good or bad,[4] and the personal attributes of an individual. It might also include such personal traits as honesty, loyalty, integrity, reliability, and other such characteristics, good or bad, which make up one's individual personality. A discussion of any person relating to any such matters may therefore, under § 13-5-1, be permitted at an executive session.
The Council points out many other instances, not issues at trial, where an executive session would be desirable. Most "sunshine laws" have a list of exceptions to cover these situations. Others have no such exceptions or very limited exceptions. Our statute falls within this latter category. Thus, faced with a wide variety of situations which might arguably benefit the public if discussed in a closed meeting, we should not venture to speculate which ones our legislature might have included in "sunshine laws" had it seen fit to do so. For, the point is, our statute permits but one exception. See Channel 10, Inc. v. Independent School District No. 709, supra.
The Council contends that there is no evidence that the "sunshine laws" were violated in this instance. The trial judge held that the News was entitled to relief.
Implicit in this holding is a finding that "character" or "good name" was not the sole discussion at the March 20 meeting. We find the record supports the trial judge in this regard. Based upon the record, such a finding is not clearly erroneous and against the great weight and preponderance of the evidence. Lipscomb v. Tucker, 294 Ala. 246, 254, 314 So.2d 840 (1975). Therefore, this aspect of the final judgment must be affirmed.
Finally, the Council contends that the injunction is too broad and fails to comply with the requirements of Rule 65(d)(2), ARCP. We agree.
The meetings resulting in this action were meetings concerning the appointment of individuals to a public body. The majority of the evidence presented showed there were past "executive" meetings where similar appointments were made. In a comparable situation in Channel 10, Inc. v. Independent School District No. 709, supra, the Minnesota Supreme Court refused to consider exceptions to the open meetings law which were not litigated at trial. The court then found that the injunction, which prohibited "any secret or closed meetings not open to the public or the news media," lacked the specificity required for injunctive relief.
In Fiscal Court v. Courier-Journal & Louisville Times Co., 554 S.W.2d 72 (Ky. 1977), the Supreme Court of Kentucky held that an injunction which did no more than direct the defendant to obey the "Kentucky Open Meetings Law" was too vague. The court observed through Justice Lukowsky:

"An injunction ought not enjoin in general terms the violation of the Interstate Commerce Act. Russell C. House Transfer & Storage Co. v. U. S., C.A. 5th, 189 F.2d 349 (1951). Blanket injunctions against general violation of a statute are repugnant to the American spirit and should not lightly be either administratively sought or judicially granted. Beatty v. U. S., C.A. 8th, 191 F.2d 317 (1951).

*682 The mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged. NLRB v. Express Pub. Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941)." [Emphasis supplied.]
Id. at 73-74.
We agree with these observations and must conclude that the injunction in the instant case is too broad. It prohibits the Council "from excluding any of the public from any of its meetings and from meeting in secret or executive sessions except, `when the character or good name of a woman or man is involved' in matters considered and discussed." This injunction, like that in Fiscal Court, supra, merely directs obedience to the "sunshine laws."
Further, the injunction does not comply with Rule 65(d)(2), ARCP, which requires an injunction to contain (1) reasons for its issuance, (2) specific terms, and (3) a reasonably detailed description of the acts sought to be restrained. These requirements are mandatory. International Brotherhood of Electrical Workers v. Morton, 365 So.2d 662 (Ala.1978). There, we noted that in Schmidt v. Lessard, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), the United States Supreme Court held:
"`As we have emphasized in the past, the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.. . . Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.
"The requirement of specificity in injunction orders performs a second important function. Unless the trial court carefully frames its orders of injunctive relief, it is impossible for an appellate tribunal to know precisely what it is reviewing.. . .' [Footnotes omitted.]"
We think the injunction here is not specific enough with respect to (2) and (3). Moreover, we think the trial judge erroneously enjoined all but negative or derogatory character or good name.
Therefore, although we agree, in general, with most of the conclusions reached by the able trial judge, this cause must be reversed and remanded in order for the court to tailor its injunction to the facts litigated. The Council should be enjoined from holding executive or secret sessions to consider or discuss the appointment or employment of an individual to a public office or board, except when the individual's "character or good name," as defined herein, is involved. If "character or good name" is involved, the Council may, but is not required to, go into executive session, at which time nothing other than the individual's "character or good name" may be discussed.
We realize that it may be difficult to draw the line and separate such discussion in executive session, respecting "character or good name" from general discussions respecting personnel matters or appointments which may not deal with "character or good name."
It must be readily apparent from the record in this case that the purpose of permitting the exception in question to our "sunshine laws" is to permit the board, commission, council, etc., to have free and wide-ranging investigation and discussion as to the "character or good name" of prospective appointees, personnel already employed, and the like; and, to protect the "character or good name" of such persons during such discussions.
This cause is therefore affirmed in part, reversed in part, and remanded for entry of a final judgment in accordance with the foregoing opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
*683 MADDOX, FAULKNER, JONES, SHORES and EMBRY, JJ., concur.
BEATTY, J., concurs in the result.
TORBERT, C. J., and ALMON, J., concur in part and dissent in part.
OPINION CORRECTED. APPLICATION FOR REHEARING OVERRULED.
TORBERT, Chief Justice (concurring in part and dissenting in part):
I agree with the majority to the extent of its holding that the Birmingham News does have standing to enforce the open meeting laws and that the injunction entered by the trial judge is overbroad.
However, the central issue involves a judicial determination of legislative intent and purpose. This issue arises in the context of the Birmingham City Council's fifteen-year practice of conducting personal interviews of prospective appointees of the Council in closed sessions. The majority correctly reads in pari materia the provisions of Code 1975, § 13-5-1, with Code 1975, § 11-43-49, and § 3.12 of the Mayor-Council Act. The Alabama Legislature as early as 1915 first recognized the public necessity of mandating, under the penalty of criminal sanctions, that no secret sessions of certain named public bodies be held; but likewise, the legislature wisely provided an exception "when the character or good name of a woman or man is involved." Code 1975, § 13-5-1.
The basis for the holding of the majority is the statement "that `character or good name' as used in § 13-5-1, does not per se include a session considering an appointment or personnel matters."
"Character" is "[t]he aggregate of the moral qualities which belong to and distinguish an individual person; the general result of the person's distinguishing attributes" a person's fixed disposition or tendency as evidenced to others by his habits of life. Black's Law Dictionary 294 (4th ed. 1968); Keith v. State, 127 Tenn. 40, 152 S.W. 1029, 1030 (1913). "Character" has also been defined as a distinctive trait, quality or attribute; an individual's pattern of behavior or personality, moral constitution, fortitude, reputation; and a description of the traits or qualities of a person or type. See Webster's New International Dictionary of the English Language 451 (2d ed. 1934).
The majority would allow a public body to meet in closed session only when the appointee's "character or good name," as defined by the majority, is the sole discussion.
It is my view that the process of interviewing prospective appointees necessarily involves "character and good name," and, thus, the Legislature intended to allow executive sessions for such purpose. The consideration of "character and good name" is such an integral part of the interview process and is so intimately associated with an interview that, as a practical matter, an interview may be said to involve the consideration of "character and good name." It is obvious to me that inquiries relating to a potential appointee's past employment, how he or she performed prior jobs or positions, and the reasons for a change in job or employment reflect upon and reveal his or her "character" as well as providing strictly biographical information. Likewise, it would seem that inquiries as to military service, credit standing, and police records also cast illumination on the prospective appointee's character. The majority correctly notes that many states have open meeting laws which specifically provide that the public may be excluded when considering appointments, employment, or personnel matters. While our statute does not use these particular words, I believe that the legislature in using the words "character and good name" actually intended to allow closed sessions in such cases, particularly personal interview sessions.
In affirming the trial judge's holding that the plaintiffs were entitled to injunctive relief, the majority of this court finds it implicit that "character or good name" was not the sole discussion at the council meeting in issue. This view, if carried to its logical extreme, would cause interview sessions *684 to oscillate in and out of closed doors depending upon the question asked at the moment. I do not believe the meetings of public bodies would be manageable under such a state of the law.
Moreover, to require interviews to be open to the public would have a chilling effect on full and detailed inquiries as to prospective appointees. Qualified persons would be reluctant to seek or accept appointments if personal interviews were required in public. Members of public bodies would be inhibited from fully investigating the suitability of the prospective appointee. Council members in this case testified that they are reluctant to pursue certain inquiries in public. They also testified that often inquiries are made without knowledge of the answer. Disparaging inferences can be drawn from the most innocent but probing inquiry. For instance, if a prospective appointee is asked at an open interview, "Do you have a health problem?" or "Do you have an alcohol problem?", unwarranted inferences may be drawn that the individual has an alcohol problem or has poor health whereas, in actuality, he or she has neither. In fact, Councilman Herring testified that he was inhibited from going into certain matters even at the closed meeting in this case. He stated: "I know I at one time thought about getting into it [character and good name], but because of the unsettling conditions of that meeting I did not feel that my confidence in the people in the meeting to hold what was said there, I didn't feel that I could speak openly because I did not feel that what I said would remain private."
Testimony by various council members in this case established that the interviewing of prospective appointees to a public body necessarily involves a consideration of certain factors, or, of the prospective appointee's "character and good name." For instance, in describing the interview process, Ms. Miglionico stated the following:
Well, I think you can start basically with the person's education, and when you are inquiring you want to go deeper than just what kind of a degree the person has. You want to know exactly what he took, how much he got out of it, and exactly how he reacts with reference to that education.
When you go into his training or his business ability you want to know exactly how many different types of jobs he has changed, his reasons or motivation for changing that employment.
When you go into training you would like to know what kind of training this person has and how he is going to react to the job for which you are considering him.
Then you go into his personal traits and attitudes. Does he like women? Does he like blacks? Does he approve of what the City Government is trying to do, or does he not?
All of these things are things that are subjective in nature. You can't very well ask a question. If you ask about people to whom he is indebted at the moment, how many bills does he have, this type of thing, you would not ask the person in public, because it would be information that should not be disseminated.
His attitudes, his character, whether he goes to church, whether that is important to any particular member of the Council or not.

All of these types of things you would ask and they go to the subjective problems of whether this person is the best that the City can give to us for that particular appointment. [Emphasis added.]
Therefore, it seems implicit to me that the "character and good name" exception to § 13-5-1 was intended to allow a public body to meet in private to conduct personal interviews. "Character and good name" are so intertwined with the interview process that it is essential to fulfilling the purpose of the statute that the public body be allowed to interview prospective appointees in closed meetings. Otherwise, the practical effect may very well be to encourage the kind of secret or underground meeting proscribed by the statutes. I can envision the situation where less than a majority, *685 meeting secretly in small private groups, dominates the will of the public body which is now restrained from meeting as a whole with full and free consideration and discussion of personnel matters. Thus, we may find the anomalous situation where the act, as construed, perpetuates the evil it was intended to prevent.
For the above reasons, I conclude that the Legislature intended to create the "character and good name" exception to § 13-5-1 to encompass such situations as the interviews of prospective appointees particularly where the session was not a meeting conducted for the purpose of taking final action. Cf. Adler v. City of Culver City, 184 Cal.App.2d 763, 7 Cal.Rptr. 805 (1960); Turk v. Richard, 47 So.2d 543 (Fla.1950). Accordingly, I would hold that "character and good name" include per se personal interviews for appointment to public bodies.
ALMON, J., concurs.
NOTES
[1] Act No. 452, Acts of the Legislature, Regular Session, 1955, Vol. II, p. 1004.
[2] Appointment or employment: E. g., Ariz.Rev. Stat.Ann. § 38-431.03 (Supp.1978); N.C.Gen. Stat. § 143.318.3 (1978).

Personnel matters: E. g., Kan.Stat.Ann. § 75-4319 (1977); N.M.Stat.Ann. § 10-15-1 (1978).
[3] E. g., Mich.Stat.Ann. § 15.268 (Supp.1978); Neb.Rev.Stat. § 84-1410 (Reissue 1976).
[4] E. g., DeArman v. The State, 71 Ala. 351 (1882).