PER CURIAM.
Clay C. Slagle appeals from the dismissal by the Montgomery Circuit Court of his action against the seven members of the Montgomery County Board of Education (“the Board”) and the superintendent of the Montgomery County School System alleging that they violated the Alabama Open Meetings Act, § 36-25A-1 et seq., Ala.Code 1975 (hereinafter referred to as “the Act”). We affirm.

I. Facts and Procedural History

At the time of this action, the Board consisted of seven members: Board President Beverly Ross,[1] Melissa Snowden, Heather Sellers, Charlotte Meadows, Eleanor Dawkins, Mary Briers, and Robert Porterfield.
In April 2009, the then superintendent of the Montgomery County School System resigned and Slagle was appointed the interim superintendent while the Board conducted a search for a new superintendent. On June 15, 2009, four members of the Board — Ross, Dawkins, Briers, and Port-erfield — were individually invited to attend an annual gathering of local, elected officials. Ross testified that each of these members had attended this event in previous years but that all four never had attended at the same time. On this occasion, however, it is undisputed that all four members attended the event. It is also undisputed that as soon as those members of the Board realized that four of them were present, Dawkins left the event so that it could not be said that a quorum of the Board was gathered at the event. At some point, Ross left the event and Daw-kins returned to the event so that she could participate in part of it.
There is conflicting evidence as to the nature of the discussion that occurred at the June 15, 2009, event between the Board members who attended it. Slagle testified that, at a meeting of the Board held on July 1, 2009, one Board member made a comment about a previously held “secret meeting” of Board members, apparently referring to the June 15, 2009, event at which Ross, Dawkins, Briers, and Porterfield were present. Slagle also testified that he had been told by an elected official that at the June 15, 2009, event *120 these four Board members discussed the applications for the superintendent position and the qualifications of Slagle and other applicants. Board member Meadows testified that Board member Briers had made comments to her indicating that matters relating to the selection of a new superintendent were discussed at the June 15, 2009, event.
None of the Board members present at the June 15, 2009, event, however, confirmed that they deliberated about filling the superintendent position or other Board business at the event. Specifically, Ross testified in her affidavit that the members discussed “community” issues at the event with other elected officials. Briers admitted at trial that the Board members who participated in the June 15 event talked about “the system,” but she denied that there was discussion of the selection of a superintendent for the school system. Another witness, Montgomery City Councilman Tracy Larkin, testified that “Montgomery public education was discussed at the meeting.”
At the July 1, 2009, public meeting of the Board, the Board voted to hire Barbara Thompson as superintendent of the Montgomery County School System.[2]
On November 11, 2009, Ross sent a memo to the other members of the Board asking them to attend meetings on November 16, 2009, with Superintendent Thompson to discuss Thompson’s goals and objectives for the school district. President Ross scheduled the following “groups” of Board members to meet in succession with the superintendent on the following schedule:
10:00-10:45 a.m. — Ross, Snowden, and Dawkins.
11:00-11:45 a.m. — Ross, Briers, and Meadows.
12:00-12:45 p.m. — Ross, Sellers, and Porterfield.
It is undisputed that the Board members discussed the same matters in each meeting, that no more than three members of the Board were present in each meeting with Superintendent Thompson,[3] and that no notice of these meetings was provided to the public. In a public meeting held the next day, November 17, 2009, the Board approved the superintendent’s report.[4]
On December 4, 2009, Slagle filed this action against Board members Ross, Snowden, Sellers, Meadows, Dawkins, Briers, and Porterfield in their official capacities and against Thompson in her official capacity as superintendent, alleging that the Board members violated the Act on June 15, 2009, and that the Board members and Superintendent Thompson violated the Act on November 16, 2009. The defendants subsequently filed motions to dismiss Slagle’s complaint.
The trial court held a preliminary hearing on Slagle’s complaint, during which it accepted testimony from several witnesses. Following the hearing, on January 28, 2010, the trial court entered an order granting the defendants’ motions to dismiss. The trial court concluded that, because a quorum was not physically present and discussing Board business at any giv *121 en time on either June 15 or November 16, the Board did not hold a “meeting,” as that term is defined in the Act, on either occasion. Based on this finding, the trial court dismissed Slagle’s claims against the Board members and Superintendent Thompson. Slagle appeals the trial court’s judgment of dismissal.

II. Procedure in the Trial Court Under the Open Meetings Act and this Court’s Standard of Review

Section 36-25A-9, Ala.Code 1975, of the Act explains the procedure to be followed in an action alleging a violation of the Act. Subsection (a) provides that “[ejnforcement of this chapter may be sought by civil action brought in the county where the governmental body’s primary office is located by ... any Alabama citizen” and that “[a] preliminary hearing on the complaint filed shall be held no later than 10 business days after the date of the filing of the defendant or defendants’ initial response to the complaint....”
Section 36-25A-9(b), Ala.Code 1975, sets out the standard of proof required for the plaintiffs complaint to survive the preliminary hearing. In pertinent part, § 36-25A-9(b) provides:
“(b) In the preliminary hearing on the complaint, the plaintiff shall establish by a preponderance of the evidence that a meeting of the governmental body occurred and that each defendant attended the meeting. Additionally, to establish a prima facie case the plaintiff must present substantial evidence of one or more of the following claims:
“(1) That the defendants disregarded the requirements for proper notice of the meeting pursuant to the applicable methods set forth in Section 36-25A-3.
[[Image here]]
“(4) That, other than a claim under subdivisions (1) through (3), the defendants intentionally violated other provisions of this chapter.”
Subsection (c) explains that “[i]f the court finds that the plaintiff has met its initial burden of proof as required in subsection (b) at the preliminary hearing, the court shall establish a schedule for discovery and set the matter for a hearing on the merits.” § 36-25A-9(c), Ala.Code 1975.
The trial court in this case concluded that Slagle did not satisfy his initial burden of proof prescribed by § 36-25A-9(b). Although this Court reviews a trial court’s findings of fact based on evidence received ore tenus under a deferential standard, see Ex parte Pielach, 681 So.2d 154, 154-55 (Ala.1996), the present appeal turns upon the proper interpretation of the law and the proper application of that law to the facts, matters this Court addresses de novo. See Espinoza v. Rudolph, 46 So.3d 403, 412 (Ala.2010).

III. Analysis

A. Substantive Statutory Provisions

It is undisputed that the Board qualifies as a “governmental body” that is subject to the provisions of the Act. It also is undisputed that, if a “meeting,” either of the Board or of a committee of the Board, as that term is defined by the Act, occurred on either June 15, 2009, or November 16, 2009, the requirement for public notice of that meeting was not met.
Section 36-25A-2, Ala.Code 1975, defines pertinent terms used in the Act. It defines “meeting” as follows:
“(6) Meeting, a. Subject to the limitations herein, the term meeting shall only apply to the following:
“1. The prearranged gathering of a quorum of a governmental body or a quorum of a committee or subcommittee of a governmental body at a time *122 and place which is set by law or operation of law.
“2. The prearranged gathering of a quorum of a governmental body or a quorum of a committee or subcommittee of a governmental body during which the body, committee, or subcommittee of the governmental body is authorized, either by law or otherwise, to exercise the powers which it possesses or approve the expenditure of public funds.
“3. The gathering, whether or not it was prearranged, of a quorum of a governmental body or a quorum of a committee or a subcommittee of a governmental body during which the members of the governmental body deliberate specific matters that, at the time of the exchange, the participating members expect to come before the body, committee, or subcommittee at a later date.
“b. The term ‘meeting’ shall not include:
“1. Occasions when a quorum of a governmental body, committee, or subcommittee attends social gatherings, conventions, conferences, training programs, press conferences, media events, or otherwise gathers so long as the governmental body does not deliberate specific matters that, at the time of the exchange, the participating members expect to come before the governmental body at a later date.
“2. Occasions when a quorum of a governmental body gathers, in person or by electronic communication, with state or federal officials for the purpose of reporting or obtaining information or seeking support for issues of importance to the governmental body.”
Section 36-25A-2 defines the term “deliberation” as follows:
“(1) Deliberation. An exchange of information or ideas among a quorum of members of a governmental body intended to arrive at or influence a decision as to how the members of the governmental body should vote on a specific matter that, at the time of the exchange, the participating members expect to come before the body immediately following the discussion or at a later time.”
Finally, the term “quorum” is defined in § 36-25A-2(12) as “a majority of the voting members of a governmental body.” It is undisputed that the Board consists of seven members; thus, a gathering of four members of the Board constitutes a quorum of the Board.

B. Whether There Was a “Meeting” of “the Board” on Either June 15 or November 16

Slagle contends that the June 15, 2009, event involving local elected officials qualifies as a “meeting” of the Board because, he argues, four members of the Board were together at one point at the event and two of those members purposefully rotated in and out of the event to prevent a quorum of the Board from forming. He also alleges that the Board members present deliberated about matters that came before the Board in a subsequent public meeting. Specifically, Slagle alleges that the Board members discussed the qualifications of applicants for the superintendent position, and it is undisputed that at the next public meeting of the Board on July 1, 2009, the Board voted to hire Thompson as superintendent of the Montgomery County School System. Slagle urges this Court to conclude that a “meeting” of the Board occurred at the June 15, 2009, event within the meaning of § 36-25A-2(6)a.3 because we “should not allow an attempt of a governmental body to gov *123 ern in secret, as occurred here, by rotating Board members in and out of a meeting to avoid the simultaneous appearance of a quorum.”
Likewise, Slagle contends that the three sequential meetings that occurred on November 16, 2009, “were, in substance and in essence, one ‘meeting[1] of the Board, and thus were subject to the Open Meetings Act.” Slagle argues that even though a quorum of Board members was not present in one place at precisely the same time, a “gathering” of the Board occurred between the hours of 10:00 a.m. and 12:45 p.m., in light of the nature of the “serial meetings” that were conducted and knowingly attended as such by the members of the Board.
Slagle notes that this Court held in the oft-cited case of Miglionico v. Birmingham News Co., 378 So.2d 677 (Ala.1979), that the predecessor to the Open Meetings Act, Alabama’s Sunshine Law, “ ‘was [enacted] wholly in the public interest and is to be liberally interpreted’ most favorably to the public.” 378 So.2d at 680 (quoting Laman v. McCord, 245 Ark. 401, 405, 432 S.W.2d 753, 755 (1968)). Slagle states that he is asking for nothing more than a “liberal construction” of the term “meeting” as used in the Act so that, he says, the deliberative process of governmental bodies remains open to the public.
The Alabama Press Association has filed an amicus brief in support of Slagle’s appeal. The Alabama Press Association argues that, if we approve the serial arrangement used by the Board on November 16, we will have “established a road map for how to deliberate, influence, and poll votes on public issues without calling public meetings.”
Although we agree that we must liberally construe the terms of the Act so as to accomplish its purpose, the fact remains that we are limited by those terms. The judiciary cannot undertake to aid the legislature in its task by treating the Act as if it uses some different terms. Indeed, it is only in the terms of the Act that we know what “task” the legislature truly undertook. If the meaning of those terms is plain and unambiguous, we are not free to derive from them some different meaning.
“The cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute. Gholston v. State, 620 So.2d 719 (Ala.1993). Absent a clearly expressed legislative intent to the contrary, the language of the statute is conclusive. Words must be given théir natural, ordinary, commonly understood meaning, and where plain language is used, the court is bound to interpret that language to mean exactly what it says.”
Ex parte State Dep’t of Revenue, 683 So.2d 980, 983 (Ala.1996). “ ‘ “If a statute is not ambiguous or unclear, the courts are not authorized to indulge in conjecture as to the intent of the Legislature or to look to consequences of the interpretation of the law as written.” ’ ” Ex parte Morris, 999 So.2d 932, 938 (Ala.2008) (quoting Gray v. Gray, 947 So.2d 1045, 1050 (Ala.2006), quoting in turn Ex parte Presse, 554 So.2d 406, 411 (Ala.1989)).
Slagle argues that the June 15, 2009, event and the meetings that occurred on November 16, 2009, constitute “meeting[s]” of the Board as that term is defined by § 36-25A-2(6)a.3, Ala.Code 1975. That section states that a “meeting” includes a “gathering, whether or not it was prearranged, of a quorum of a governmental body ... during which the members of the governmental body deliberate specific matters that, at the time of the exchange, the participating members expect to come before the body ... at a later date.” As *124 noted above, a “quorum” is defined in § 36-25A-2(12) as “a majority of the voting members of a governmental body.”
The term “gathering” is not given any special definition in the Act. Webster’s Third New International Dictionary of the English Language Unabridged 940 (2002) defines it as “a coming together of people in a group.” If the phrase “coming together” does not mean — and plainly so— a coming together at the same time, then both it and the term “gathering” would appear to be left with no real meaning. Thus, a plain reading of § 36-25A-2(6)a.S yields the conclusion that a “meeting” occurs when a majority of the members of a governmental body come together at the same time.
Neither the gatherings on June 15, 2009, nor any of the gatherings that occurred on November 16, 2009, qualify as “meetings” of the Board under the statutory definition of that term. Although a majority of the Board members initially were together at the same time during the June 15, 2009, event, once that fact was noticed, one of the Board members left the event. No Board business was discussed during the brief gathering that occurred before one of the members left and less than a quorum remained. It is undisputed that, during the remainder of the June 15 event (when conflicting evidence indicates that Board business may have been discussed), a majority of the Board members were not together at the same time. Likewise, it is undisputed that a majority of the Board members were not together at any time on November 16, 2009. Accordingly, the events of June 15 and November 16 did not involve “meetings” of the Board according to the definition provided in § 36-25A-2(6)a.3.
It is true that the purpose of the Act is similar to its sister act, the Open Records Act, which this Court has stated “is remedial and should therefore be liberally construed in favor of the public.” Water Works & Sewer Bd. of Talladega v. Consolidated Publ’g, Inc., 892 So.2d 859, 862 (Ala.2004). As the rules of statutory construction quoted above make clear, however, the primary evidence of legislative intent is the language of the statute itself, and “[i]f the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992). In other words, we are not free to take up Slagle’s invitation to provide a “liberal construction” of the term “meeting” as defined in the statute because the language of the Act defining that term is plain and unambiguous. See Ex parte Morris, 999 So.2d at 937 n. 1 (noting that a “limitation on the rule of liberal construction [is] that such construction must be one that the language of the statute fairly and reasonably supports. A construction cannot be said to be fairly and reasonably supported when it is necessary to resort to judicial interlineation of a term that alters the plain meaning of the statute”).
We find unpersuasive the cases from other jurisdictions cited by Slagle and the Alabama Press Association in its amicus brief that have interpreted open-meetings laws in those jurisdictions more broadly because, with one exception, those courts failed to address whether the statutes they were construing were ambiguous before judicially construing the term “meeting” as used in those statutes. See, e.g., Esperanza Peace & Justice Ctr. v. City of San Antonio, 316 F.Supp.2d 433 (W.D.Tex.2001); State ex rel. Cincinnati Post v. Cincinnati, 76 Ohio St.3d 540, 668 N.E.2d 903 (1996); Booth Newspapers, Inc. v. Wyoming City Council, 168 Mich.App. 459, *125 425 N.W.2d 695 (1988); Stockton Newspapers, Inc. v. Members of Redev. Agency, 171 Cal.App.3d 95, 214 Cal.Rptr. 561 (Cal.Ct.App.1985); Brown v. E. Baton Rouge Parish Sch. Bd., 405 So.2d 1148 (La.Ct.App.1981); and Blackford for Use & Benefit of Cherokee Jr. High Sch. Parent-Teacher Ass’n v. School Bd. of Orange Cnty., 375 So.2d 578 (Fla.Dist.Ct.App.1979).
In the one ease that is an exception, Right to Know Committee v. City Council, City & County of Honolulu, 117 Haw. 1, 10-12, 175 P.3d 111, 120-22 (Haw.Ct.App.2007), the Hawaii Court of Appeals did not find the term “meeting” to be ambiguous. Rather, it pointed to a subsection of Hawaii’s Sunshine Law that provides that “ ‘[n]o chance meeting, permitted interaction, or electronic communication shall be used to circumvent the spirit or requirements of [the Sunshine Law]....’” 117 Haw. at 11, 175 P.3d at 121 (quoting Hawaii Rev.' Stat. § 92-5(b)). The court found that “[t]he phrase ‘circumvent the spirit’ of the Sunshine Law is far from plain and unambiguous.” 117 Haw. at 12, 175 P.3d at 122. Thus, the legislature in that case provided the Hawaii Court of Appeals a textual basis upon which that court could and did act,[5] which the legislature of this State has not done in our statute.
In contrast, in cases in which courts have applied a plain-meaning analysis to their open-meetings statutes, they have arrived at the same conclusion we arrive at in this case. For example, in Dillman v. Trustees of Indiana University, 848 N.E.2d 348 (Ind.Ct.App.2006), the plaintiffs alleged that the trustees of the University of Indiana had violated Indiana’s Open Door Law when an executive session of trustees met to discuss terminating the employment of the University’s basketball coach and when the president of the University had met informally with some trustees in his home concerning the same subject. The Dillman court declined to find that these meetings violated Indiana’s Open Door Law. At the outset, the Dill-man court noted that “[t]he purpose of the Open Door Law is to assure that the business of the State of Indiana and its political subdivisions be conducted openly so that the general public may be fully informed” and that the court must “liberally construe the statute in order to give effect to the legislature’s intention.” 848 N.E.2d at 351. Indiana’s Open Door Law defined a “meeting” as “ ‘a gathering of a majority of the governing body of a public agency for the purpose of taking official action on public business.’ Ind.Code § 5-14-1.5-2(c) (2002 & Supp.2005).” Id. Just as Slagle argues before this Court, the appellants in Dillman “assert[ed] that because ‘there is no specific language that requires that a majority of a political subdivision meet simultaneously in one room at the same time,’ the term meeting must be construed to include consecutive gatherings of less than a majority.” Id. The Dillman court concluded, however, that, although the law must be liberally construed, “the legislature has specifically defined ‘meeting’ under the Open Door Law as ‘a gathering of a majority of the governing body_’ Ind.Code § 5-14-1.5-2(e). Thus, without a majority present, no meet *126 ing occurs for purposes of the Open Door Law.” Id.
In Dewey v. Redevelopment Agency of Reno, 119 Nev. 87, 64 P.3d 1070 (2003), the Nevada Supreme Court declined to find that “back-to-back briefings” of the members of the City of Reno’s Redevelopment Agency “created a constructive quorum or serial communication in violation of’ Nevada’s Open Meeting Law. 119 Nev. at 98, 64 P.3d at 1077-78. Similar to the Act, Nevada’s Open Meeting Law defined a “meeting” as “ ‘the gathering of members of a public body at which a quorum is present to deliberate toward a decision or to take action on any matter over which the public body has supervision, control, jurisdiction or advisory power.’ ” 119 Nev. at 95, 64 P.3d at 1076 (quoting Nev.Rev. Stat. 241.015(2) (1999)). The Court specifically noted that “‘“[w]here the language of a statute is plain and unambiguous, and its meaning is clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself.” ’ ” 119 Nev. at 94, 64 P.3d at 1075. The Dewey Court noted that a quorum was not present at the meetings, and it reasoned that “the quorum standard is a ‘brightline standard [in] legislative recognition of a demarcation between the public’s right of access and the practical necessity that government must function on an orderly, but nonetheless legitimate, basis.’” 119 Nev. at 98, 64 P.3d at 1078 (quoting Delaware Solid Waste Auth. v. News-Journal Co., 480 A.2d 628, 635 (Del.1984)).
Cases such as Dillman and Dewey illustrate that where the language of an open-meetings statute is clear and unambiguous, a court must effect the intent of the legislature by strictly applying the statute as written. “This Court is not at liberty to rewrite statutes or to substitute its judgment for that of the Legislature.” Ex parte Carlton, 867 So.2d 332, 338 (Ala.2003). The Act clearly defines the term “meeting” to include a gathering of a majority of the members a governmental body. In the instances challenged in this case, no such gatherings of the Board occurred so as to constitute a meeting of that body within the meaning of § 36-25A-2(6)a.3.

C. Whether Each Separate Gathering on November 16 Constituted a “Meeting” of a “Committee”

Slagle contends that the three groups appointed, scheduled, and presided over by Board President Ross on November 16 implicated the Act for a second reason. Slagle contends that, given the manner in which these groups were appointed by the president of the Board, the purpose for which these groups were appointed, and the manner in which they did in fact function on November 16, these groups must be considered “special committees” of the Board within the meaning of the Act. For the reasons discussed below, we agree. That each of these groups is properly considered a special committee of the Board, however, does not answer the separate question — whether Slagle has presented a ground upon which we should conclude that each of these special committees conducted a “meeting” within the meaning of § 36-25A-2(6). We first discuss our conclusion that each of these “groups” is properly considered a “committee” of the Board.
Slagle correctly notes that the Act applies not only to meetings of governmental bodies as a whole, but also to “[t]he gathering ... of ... a quorum of a committee or a subcommittee of a governmental body ....” § 36-25A-2(6)a.3., Ala.Code 1975. The Act states that a “governmental body” includes “all standing, special, or advisory committees or subcommittees of, or ap *127 pointed by, the body.” § 36-25A-2(4), Ala.Code 1975. Although the Act does not define “committee” or “special committee,” nothing in the Act limits that concept to groups expressly labeled as such by the presiding officer, or by the body itself, and it scarcely could be contended that a group that otherwise functions as a committee for purposes of the Act could avoid the operation of the Act simply by using a moniker such as “group” rather than “committee.”
Further, the manner in which the groups in question were formed comports with the Board’s established procedures for forming committees. Specifically; the Board’s procedures manual provides that committees are appointed by the president of the Board: “It is the duty of the chairman [or president] of the Board to appoint all committees except where the Board itself decides otherwise.” The three groups at issue here were appointed by President Ross. Not only did she appoint the members of each group, she set their respective meeting times, prescribed the agenda for each meeting, and presided over the fulfillment of that agenda. The Board’s procedures manual also expressly limits the size of any one committee to three board members: “No more than three (3) Board members shall be appointed to a committee.” President Ross observed this limitation by appointing three members of the Board to each of the groups in question. Finally, the procedures manual provides that, in addition to standing committees, committees can be appointed “on an ad hoc basis.” The three groups at issue here were so appointed.
With respect to the provision in the Act for “special committees,” Slagle observes that “words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where pain language is used a court is bound to interpret that language to mean exactly what it says.” Slagle’s brief, at 41 (quoting Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998), quoting in turn IMED Corp., 602 So.2d at 346). He then notes that Black’s Law Dictionary 290 (8th ed.2004) defines a “special committee” simply as a committee established for a “particular purpose or a limited time.” (Emphasis added.) We agree that this definition aptly characterizes the groups appointed by President Ross and directed by her to meet on November 16 both for a “particular purpose” and for a “limited time.” Specifically, as President Ross explains in her affidavit, “[a] requirement in the Superintendent’s employment contract "with the Board was for the superintendent to submit to the Board her goals and objectives for the district [and that] these goals and objectives be reviewed by the Board on or before November 30, 2009.” Although this review could have been accomplished by the Board in its public meeting on the following day, November 17, 2009, President Ross expressly admits that she organized and scheduled the three groups in question specifically as a means for “the Board” to fulfill its duties in this regard in private: “In order for the Board [to] review the goals and objectives before the required date, I scheduled three (3) group meetings of members of the board for Monday, November 16, 2009 to meet with the Superintendent.”
In addition, the aforesaid purpose stated by President Ross and acknowledged by the testimony of other Board members comports with provisions of that section of the Board’s procedures manual that addresses “Committees of the Board of Education.” That section states, in pertinent part:
“Committees — The Board may delegate portions of its exploratory, fact-finding, and preliminary work to committees. *128 These are advisory, however, and have no power to take action, whatsoever, or to commit the Board to any course of action. All committees shall make a report of their findings.”[6]
(Emphasis added.) That is precisely what the Board appears to have done in this case.
The evidence before the trial court was to the effect that the Board had in the past commonly used what was called the “small-group” approach. In an e-mail to a Board member attempting to defend the practice, Ramadanah Jones, staff attorney for the Board, referenced the use of “small group meetings to work through issues .... It was my understanding that the small groups were just easier for the Board’s schedule to work through the goals and more efficient for the superintendent to gain feedback.” (Emphasis added.) The powers and functions referenced in this e-mail are, of course, the very powers and functions that the Board is supposed to be exercising and performing• in public meetings. As Board member Meadows expressed in a statement to the press that was admitted into evidence: “It was clear the only reason to form these sub-groups was to avoid the media and the public.” As she also testified in court: “I think we met in those groups in those type of settings so we could specifically avoid the media, and I think that’s wrong.”
In an effort to cast the work of the groups she appointed as being outside the scope of the Act, President Ross asserted in her affidavit that “[a]s a group of three (3) members or less, we have no authority or power to take any action on behalf of the Board.” This assertion may be true insofar as “any action” in the form of a formal, binding vote on some proposal. “Actions ... of the Board,” and a fortiori of committees, can and do include more than just voting on proposals. In this case, each of three groups appointed by the president for the explicit purpose of doing so, did in fact function as the vehicle by which the superintendent “submitted” her report to the Board. Then, in accordance with their charge by the president, each of these groups “reviewed” and “deliberated” the report among themselves and with the superintendent, all so that the members of each group would be prepared to vote upon the report at the public meeting to be held the next day. We therefore conclude that each of these groups satisfied Black’s definition of a “special committee,” having been appointed for “a particular purpose” and “a limited time.”
We turn now to the question whether we have before us in this case any ground upon which we should conclude that the three “special committees” appointed by President Ross engaged in “meetings” within the meaning of that *129 term as defined in § 36-25A-2(6)a. That section provides three grounds upon which a group may be considered to hold a “meeting.” The first, set out in clause 1, requires a gathering of a quorum of the committee “at a time and place which is set by law or operation of law.” The second, as set out in clause 2, requires a prearranged gathering “to exercise the powers which [the committee] possesses” or to approve the expenditure of funds. Of these two, and consistent with the foregoing discussion of the powers delegated and fulfilled by the groups in question, it might be argued that clause 2 would be applicable. We decline to consider either of these clauses, however, because Slagle limits his argument to clause 3 of § 36-25A-2(6)a. We therefore turn our attention to that provision.
As previously noted, clause 3 of § 36-25A-2(6)a provides that a “meeting” includes:
“[t]he gathering, whether or not it was prearranged, of a quorum of a governmental body or a quorum of a committee or a subcommittee of a governmental body during which the members of the governmental body deliberate specific matters that, at the time of the exchange, the participating members expect to come before the body, committee, or subcommittee at a later date.”
(Emphasis added.)
As we have already noted in Part III.B. . of this opinion, when the words of a statute are clear and unambiguous, “then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” IMED Corp., 602 So.2d at 346. Slagle’s argument to this Court assumes that a “meeting” of a committee occurs under clause 3 if a quorum of that committee gathers to deliberate a specific matter that is expected to come at a later date before either that committee or the' principal, or “greater,” body of which that committee is a part. Without any citation to authority or further analysis of the point, Slagle simply asserts that “[a] gathering is a ‘meeting’ under [clause 3] where members simply deliberate matters that are expected to come before the committee or' the body at a later date.” Slagle’s brief, at 46. Thus, according to Slagle, clause 3 applies here because a quorum of each of the three special committees gathered to deliberate a matter expected to come before' the Board as a whole at a later date. Without more, we cannot agree.
To the contrary, we find that the language and syntax of clause 3 are such as to plainly address the circumstance where members amounting to a quorum of a given “governmental body” gather to deliberate in advance an issue that is expected to come before that body. That is, it applies when members amounting to a quorum of given body gather to deliberate a matter that the participants expect to come at some later date before the same body as to which those members constitute a quorum. It begins by addressing gatherings amounting to “a quorum of a governmental body or a quorum of a committee or a subcommittee of a governmental body” and then addresses “members of the governmental body” (again, a term that can refer to either a principal governmental body or to a committee or subcommittee of that body) who gather to deliberate specific matters that they expect to come “before the body, committee, or subcommittee at a later date.” (Emphasis added.)
As a corollary to the conclusion that this understanding of clause 3 reflects the plain meaning of the language and syntax employed in that provision, we note that this understanding of clause 3 avoids what the Board correctly observes would be an unreasonable meaning, and thus a meaning *130 we would be unwilling to attribute to clause 3 in any event. See Ex parte Krages, 689 So.2d 799, 805 (Ala.1997) (“ ‘ “If a statute is susceptible of two constructions, one of which is workable and fair and the other unworkable and unjust the court will assume that the legislature intended that which is workable and fair.’”” (quoting other cases; emphasis omitted)); Franks v. Jordan, 55 So.3d 1218, 1224 (Ala.Civ.App.2010) (“We must presume the legislature intended a rational result.”). Specifically, we could not read clause 3 as being intended by the legislature to impose the requirements of the Act upon any gathering of members who do not amount to a quorum of the principal, or “greater,” governmental body — but who instead amount only to a quorum of a committee of that greater body — in which the participants discuss a matter expected to come only before the greater body. As the Board members point out, such an interpretation would mean that no two members who happen to serve on any three-member committee of a greater governmental body could ever have even an informal discussion about any issue they expect to come not before their committee, but before the greater body.[7]
Based on the foregoing, we are clear to the conclusion that the gathering of a quorum of a committee (e.g., two members of a three-member committee) to discuss a specific matter which the members of the committee expect to come before their committee at a later date is the circumstance clause 3 was intended to address. Accordingly, although we agree with Sla-gle that the groups appointed and orchestrated by President Ross to perform certain tasks on November 16, i.e., to receive and deliberate the superintendent’s report, should be understood as special committees of the Board that were appointed for those particular purposes, we must reject Slagle’s argument that these committees engaged in “meetings” within the meaning of clause 3 of § 36-25A-2(6)a.[8]

*131
IV. Conclusion

A plain reading of the Open Meetings Act shows that neither the presence of Board members at the June 15, 2009, event nor the back-to-back meetings of groups of Board members on November 16, 2009, constituted a “gathering” of a quorum of the Board itself. Likewise, although the group sessions held on November 16, 2009, constituted gatherings of special committees of the Board, the meeting of such committees does not qualify as a “meeting” within the meaning of § 36-25A-2(6)a.3, Ala.Code 1975. Therefore, the trial court’s judgment in this case must be affirmed.
AFFIRMED.
WOODALL, STUART, and PARKER,. JJ., concur.
MURDOCK, J., and HARWOOD, Special Justice,* concur specially.
BOLIN and SHAW, JJ., concur in the result in part and dissent in part.
MALONE, C.J.,** and MAIN, J., dissent.
WISE, J., recuses herself.

. The president of the Board is sometimes referred to in the record as the “chairman” of the Board.

. It is not clear from the record before us whether or to what extent there was any discussion to hire Thompson at the July 1, 2009, public meeting before the vote was tak-

. The superintendent is not a member of the Board.

. There was some discussion of the superintendent’s report before the Board voted upon it in the November 17 meeting, but the record is unclear as to the extent of that discussion.

. The Hawaii Court of Appeals concluded:
"When [Honolulu City] Council members engaged in a series of one-on-one conversations relating to a particular item of Council business (the council resolution in this case), the spirit of the open meeting requirement was circumvented and the strong policy of having public bodies deliberate and decide its business in view of the public was thwarted and frustrated.”
117 Haw. at 12, 175 P.3d at 122.

. In their brief, the Board members very briefly, and without the accompaniment of any legal authority or further analysis, reference the fact that "there is no evidence that the[ ] groups made a report of their findings." The Board members would have us conclude that the lack of any report of findings by the groups appointed by President Ross to do the "fact-finding” and "preliminary work” of the Board must mean that those groups cannot be considered committees of the Board. First, whether a group constitutes a "committee” for purposes of the Act is governed by the Act itself and its purposes, not by definitional restrictions that a governmental body might create for itself, especially if those restrictions would work contrary to the purposes of the Act. For that matter, however, we do not read the provision in the procedures manual for committees to report findings to the Board to be an attempt to exclude any group that does not make such a report from the meaning of "committee.” We cannot conclude that a committee's failure to fulfill a procedures-manual requirement of this nature alters the intrinsic nature of and function otherwise performed by that group.

. Indeed, such an interpretation would mean that no two members of a greater governmental body could ever discuss, even in a chance encounter, any issue expected to come before that greater body if those two members also just happen to be members of any three-member committee or subcommittee found anywhere within the organizational structure of the greater body, even a committee or subcommittee with no responsibility whatsoever for the subject the two members wish to discuss. Surely, if the legislature had intended such an unusual restriction, it would have said so much more clearly and directly than does § 36-25A-2(6)a.3. Moreover, the crippling effect of such a construction would auger heavily against it. See, e.g., Hispanic Educ. Comm. v. Houston Indep. Sch. Dist., 886 F.Supp. 606, 610 (1994) ("Limiting board members’ ability to discuss school district issues with one another outside of formal meetings would seriously impede the board’s ability to function.... This job involves meaningful reflection and extensive preparation for decisions, including discussions among members of the board. Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board’s ability to conduct business.”).

. Referring to the November 16 meetings, Justice Shaw states in his special writing:
"In the instant case, the Board met in committees that consisted of a number less than a quorum of the full Board. This is the factual scenario this Court found exempt in Auburn [University v. Advertiser Co., 867 So.2d 293 (Ala.2003),] under provisions of the former Sunshine Law, which the legislature saw fit to replace with the Open Meetings Act. It seems counterintuitive that the legislature could have intended to preserve the status quo in a scenario like this....”
125 So.3d at 136 (Shaw, J., concurring in the result in part and dissenting in part). Contrary to the premise of this comment, we do not hold today that “the legislature ... intended to [or that it did] preserve the status quo” existing under the former Sunshine Law. To the contrary, we recognize today *131 that the Act explicitly prohibits ‘‘committees” from meeting in private. Specifically, the legislature changed the "status quo" as to committees in three substantial respects.
First, the Act provides that any gathering set by law of a quorum of a committee (and the legislature went even further than this and included subcommittees, which were not at issue in Auburn University), whether standing or special, is subject to the requirements of the Act. § 36-25A-2(6)a.l. Such meetings were not subject to the Sunshine Law.
Second, the Act now provides that any prearranged gathering of a quorum of a committee (or a subcommittee), whether standing or special, at which the committee exercises whatever power has been delegated to it is subject to the requirements of the Act. § 36-25A-2(6)a.2. Such meetings were not subject to the Sunshine Law. This second change alone is sufficient to reach the "status quo” circumstance that the Court in Auburn could not reach under the Sunshine Law.
Finally, the legislature went one step further and subjected to the requirements of the Act any gathering of a quorum of a committee, standing or special, at which the members present "deliberate” some matter they expect to later come before the committee of which they form a quorum. § 36-25A-2(6)a.3. Again, such meetings were not subject to the Sunshine Law.

. Before the official recompilation of the Alabama Constitution, § 147 was found at § 6.08 of Amendment No. 328, Ala. Const. 1901.