REL: March 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

———————————————

### CR-2022-0642

———————————————

### Derrick D. Peterson

### v.

### State of Alabama

### Appeal from Jefferson Circuit Court
### (CC-20-673; CC-20-674; and CC-20-675)

KELLUM, Judge.

Derrick D. Peterson was convicted of one count of intentional murder, see § 13A-6-2, Ala. Code 1975, and two counts of attempted murder, see §§ 13A-4-2 and 13A-6-2, Ala. Code 1975. The trial court

sentenced him to life imprisonment for the murder conviction and to 20 years' imprisonment for each of the attempted-murder convictions.

The evidence adduced at trial indicated the following. On the night of July 15, 2019, Peterson shot and killed Shaneia Causwell ("Shaneia"), and shot and injured Shaneia's fiancé, Brandon Dozier ("Brandon"), and her brother, Stefon Causwell ("Stefon"). The shootings occurred in front of the house where Shaneia, Brandon, and Stefon lived with Shaneia's mother, Yvonne Causwell ("Yvonne"), and her husband, Robert Wright ("Robert"), as well as Shaneia and Stefon's niece, Shaniyah Roscoe ("Shaniyah"), and Shaneia's two young children. Shaneia died from a single gunshot wound that entered the left side of her back, passed through her left lung and her heart, and exited her chest just under her right breast. Brandon was shot once in the chest, and Stefon was shot once in the back of his arm, once in the leg, and five times in the back. Six shell casings were found at the scene and forensic examination indicated that all six had been fired from the same gun. The gun was never found.

In the early afternoon the day of the shootings, Shaniyah's high-school friend, Ramiyah Pettway ("Ramiyah"), and other friends came to

2

Yvonne's house to see Shaniyah. Stefon asked Shaniyah's friends to leave and told Shaniyah that she could not have friends over to the house.[1] Shaneia then telephoned Ramiyah to tell her that she could not come back to the house. According to Shaniyah, Ramiyah's sister, Ca'Niyah Pettway ("Ca'Niyah"), got involved in the telephone conversation and Ca'Niyah and Shaneia argued. Ramiyah later contacted Shaniyah and told her that she would return Shaniyah's iPad tablet computer. That evening, Ramiyah asked Ca'Niyah to return Shaniyah's iPad for her, and Ca'Niyah and her friend, Dre'Mayah Glenn ("Dre'Mayah"), drove to Shaniyah's house to return the iPad. According to Shaniyah, after returning the iPad, the two left.

Shortly thereafter, as Shaneia and Shaniyah were leaving to go to the store, and Stefon, Brandon, and Brandon's cousin, Clint, were returning from visiting friends, Peterson, who was Ca'Niyah's boyfriend, pulled up in front of Yvonne's house in his vehicle. A few moments later, Ca'Niyah and Dre'Mayah arrived in another vehicle. All three got out of their vehicles. Stefon approached Peterson and asked who he was there

---

[1]Testimony was conflicting as to why Shaniyah was not permitted to have friends visit.

3

to see; Peterson said he came to see Shaniyah. Shaneia approached Ca'Niyah and asked whether there was a problem. A verbal argument ensued between the two women; it did not turn physical. Yvonne and Robert, having heard the commotion outside, came out and ordered everyone who did not live there to leave their property.

Testimony from the State's eyewitnesses was largely consistent as to what happened next. Clint immediately left in his pickup truck and everyone began to disperse. However, Peterson, who had been standing next to the open driver's door of his vehicle, reached inside his vehicle and rummaged around as if he were looking for something. Brandon immediately approached Peterson and asked if he was reaching for a gun. Ca'Niyah then pushed Brandon, and he stumbled down the street in front of Yvonne's house, which was on a hill. Peterson raised a gun and started firing. Both Robert and Yvonne testified that Peterson specifically targeted Brandon, Shaneia, and Stefon. According to Yvonne, Peterson first shot Brandon as he stumbled down the hill, then turned around and shot Shaneia as she was running up the hill in the opposite direction, and finally, he turned and shot Stefon as Stefon ran across the street. All the State's eyewitnesses indicated that Peterson was the only person who

4

had a gun that night and that no physical altercation had occurred before Ca'Niyah pushed Brandon and Peterson pulled out a gun and started shooting. They denied seeing Brandon punch Peterson, and Brandon denied doing so.

Peterson asserted that he was acting in self-defense when he shot Brandon, but he claimed that he did not shoot Shaneia or Stefon. Peterson testified that when he first arrived at Yvonne's house, Clint approached him wielding a gun and asked who he was. Clint's truck was parked in front of Peterson's vehicle and, when Ca'Niyah and Dre'Mayah arrived, they parked behind Peterson's vehicle. He saw Ca'Niyah and Shaneia talking, and several people were standing around his vehicle, effectively blocking him in. Yvonne then came outside and told everyone to leave. Contrary to the State's witnesses, Peterson said that Clint did not leave but that he remained standing in front of Peterson's vehicle. As Ca'Niyah and Dre'Mayah turned to walk toward their vehicle, Brandon and Stefon stopped them, acting aggressively toward them. According to Peterson, Brandon then approached him and Ca'Niyah stood between them. Brandon reached around Ca'Niyah and punched him, causing him to fall into his vehicle. He grabbed his gun from between the front seats

5

and got out of his vehicle, firing several shots at Brandon. Peterson said that, given the number of people present who were effectively blocking his vehicle, Clint's possession of a gun, and Brandon's punching him, he feared for his life, thinking "they fixing to try to kill me." (R. 563.) On cross-examination, Peterson denied that he shot Stefon or Shaneia, even accidently, while shooting at Brandon. He said that he thought Clint had shot Stefon, but he did not testify as to who he thought shot Shaneia. On re-direct examination, when asked "if someone else was shot or injured by your action, then it was totally unintended," Peterson replied in the affirmative. (R. 579.) After the shooting, Peterson said, the crowd around his vehicle dispersed and he left.

Peterson also called Ca'Niyah and Dre'Mayah to testify on his behalf; their testimony was largely consistent with Peterson's. They both said that when they arrived at Yvonne's house the second time, Peterson was sitting in his vehicle and there were some 5 to 10 men outside. Clint ordered them out of their vehicle at gunpoint. When they got out, Shaneia approached Ca'Niyah and they argued about a telephone conversation. Ca'Niyah denied ever speaking with Shaneia on the telephone, and Dre'Mayah testified that it was Ca'Niyah's mother, not

Ca'Niyah, with whom Shaneia had spoken. After Yvonne and Robert ordered everyone to leave, Ca'Niyah and Dre'Mayah tried to return to their vehicle but Brandon and Stefon would not let them leave. Peterson then got out of his vehicle and tried to de-escalate the situation, at which point Brandon approached him. Ca'Niyah stepped in front of Peterson, but Brandon "reached over Ca'Niyah" (R. 489), punched Peterson, and "tried to snatch his chains" from around his neck. (R. 497.) Peterson fell into his vehicle and then got back out, firing a gun. Ca'Niyah and Dre'Mayah ran to their vehicle and left.

After both sides rested and the trial court instructed the jury on the applicable principles of law, including the lesser-included offense of first-degree assault as to Brandon and Stefon, the jury found Peterson guilty of the intentional murder of Shaneia and the attempted murders of Brandon and Stefon as charged in the three indictments. Peterson filed a motion for a new trial, which the trial court denied after a hearing. This appeal followed.

## I.

Peterson contends that the trial court erred in not allowing him to cross-examine Brandon about Brandon's pending misdemeanor charge of

possessing a pistol without a license because, he says, evidence of the pending charge was admissible under Rule 404(b), Ala. R. Evid., to show motive and opportunity. Specifically, he argues:

> "The trial court abused its discretion in preventing Peterson's counsel from questioning [Brandon] regarding his pending criminal charges because [Rule] 404(b) allows it. Rule 404(b) allows for the introduction of specific acts of conduct if introduced for some other purpose such as motive, intent, opportunity or bias. See Ala. R. Evid. 404(b). A permissible purpose for this evidence would be to show [Brandon's] motive to lie about having a gun or being around a gun. If he was in possession of a gun as a felon, he would be subjected to additional charges. Also, if he was out on bond for one charge and was in possession of a firearm while out on bond, he would have admitted to violating the conditions of his bond. [Brandon] had many motives to be less than truthful about his conduct because of his pending gun charge. See Smith v. State, 246 So. 3d 1086 (Ala. Crim. App. 2017) (finding no error in allowing photographs of defendant's tattoos that include the word 'gangsta' for the purpose of proving identity under 404(b)). Peterson also had a permissible purpose to show that [Brandon] had the opportunity to have a firearm recently and perhaps did have a firearm on the night in question."

(Peterson's brief, pp. 61-62.) Alternatively, Peterson argues that, even if evidence of the pending charge was inadmissible under Rule 404(b), Brandon's testimony on direct examination "that he did not have a gun [the night of the shooting] because 'I couldn't even have guns,'" opened the door to allow Peterson to question [Brandon] about the recent pending firearm charge." (Peterson's brief, p 62.)

8

Before trial, the State moved in limine to prohibit the defense from questioning Brandon about any pending criminal charges against him, arguing that, although Brandon "does have prior convictions that are fair game for cross-examination … he also has pending cases in this county that we believe should not be asked about." (R. 54.) Defense counsel argued that "the question of possession of a firearm with regard to the new pending case might become relevant" if Brandon "testifies in a particular manner." (R. 55-56.) The prosecutor agreed that, "if he says that never in my life have I carried a firearm, then I understand how it could be relevant," but he argued that a "fishing expedition or trying to force open that door … would be improper." (R. 56.) The trial court reserved ruling on the motion, instructing defense counsel to request a sidebar "[b]efore you go there with him." (R. 56.)

During direct examination of Brandon, the following occurred:

"[Prosecutor]: At any point, did you pull a gun on [Peterson]?"

"[Brandon]: No, sir, I ain't have a gun.

"[Prosecutor]: Okay.

"[Brandon]: I just -- I couldn't even have guns.

9

"[Prosecutor]: Okay. And let's talk about that a little bit. You've been in trouble before, haven't you, [Brandon]?"

"[Brandon]: Yes, sir.

"[Prosecutor]: You've been convicted of possession -- a drug possession and marijuana possession, right?

"[Brandon]: Yes, sir.

"[Prosecutor]: And that's why you didn't have a gun that day?

"[Brandon]: Yes, sir.

"[Prosecutor]: Or one of the reasons you didn't have a gun that day?"

"[Brandon]: Yes, sir. I had just came out of prison."

(R. 188-89.)

During cross-examination, the following occurred:

"[Defense counsel]: What is the prior felony that you went to prison for, sir?

"[Brandon]: Marijuana.

"[Defense counsel]: All right. Do you also have a possession of a firearm involved with that?

"[Prosecutor]: Objection, Your Honor.

"THE COURT: Sustained."

(R. 217.) Defense counsel requested a sidebar, and, after a discussion regarding whether the trial court's pretrial directive to request a sidebar applied to Brandon's pending charge for possessing a pistol without a license or his prior conviction for possessing a pistol without a license, the following occurred:

"THE COURT: ... You finish cross-examining [Brandon] and no mention of a firearm unless you have a felony conviction or unless [Brandon] says something that allows you to question him about a firearm.

"....

"[Defense counsel]: I want to ask him whether or not -- since he says he -- the reason that he didn't have a gun on the night of this incident is because he says, 'I can't have a gun because I've been to prison.' I understand the prior felony thing, but if, in fact, he was arrested within the last several months and it shows that that's a complete disconnect from him stating, 'I can't have a gun,' and that he didn't have a gun on the 19th when, in fact, he had a gun within the last 2 months.

"THE COURT: ... If the witness, Mr. Brandon Dozier, had testified that I've never in my life seen a gun, been around a gun, I think that is a different story.

"But based upon his statement in response to the State, we have not reached the point where you can just ask him about a weapon.

"Now, you can ask him, did he have a gun out there on this particular occasion. You can ask him any question about did he have a gun on this particular occasion, but you cannot

11

ask him about any charges, any weapons charges, or question him about any misdemeanor conviction for a gun offense."

(R. 222-24.)

Peterson never argued to the trial court that evidence of Brandon's pending gun charge was admissible as substantive evidence under Rule 404(b) to show either motive or opportunity. Rather, he argued that evidence of the pending charge was admissible as impeachment. "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith, 526 So. 2d 880, 882 (Ala. 1987). "A defendant is bound by the grounds of objection stated at trial and may not expand those grounds on appeal." Griffin v. State, 591 So. 2d 547, 550 (Ala. Crim. App. 1991). Therefore, Peterson's Rule 404(b) argument was not properly preserved for review.

Peterson also argues that Brandon's testimony on direct examination opened the door to his being questioned about the pending charge because, he says, Brandon's testimony was inconsistent with his possessing a gun two months before the trial. According to Peterson, Brandon's testimony "is exactly the scenario that the curative admissibility doctrine is meant to apply to." (Peterson's brief, p. 63.)

12

> "It is well settled that '[w]hen one party opens the door to otherwise inadmissible evidence, the doctrine of "curative admissibility" provides the opposing party with "the right to rebut such evidence with other illegal evidence."' Ex parte D.L.H., 806 So. 2d 1190, 1193 (Ala. 2001), quoting Charles W. Gamble, McElroy's Alabama Evidence § 14.01 (5th ed.1996). '"'A party who has brought out evidence on a certain subject has no valid complaint as to the trial court's action in allowing his opponent or adversary to introduce evidence on the same subject.'"' Id., quoting Hubbard v. State, 471 So. 2d 497, 499 (Ala. Crim. App. 1984), quoting in turn Brown v. State, 392 So. 2d 1248, 1260 (Ala. Crim. App. 1980)."

Minor v. State, 914 So. 2d 372, 397 (Ala. Crim. App. 2004). In addition, "[a]n act of a witness which is inconsistent with the witness' present testimony about a material matter is a self-contradiction and, as such, is provable for purposes of impeachment." Charles W. Gamble and Robert J. Goodwin, McElroy's Alabama Evidence § 155.02(e) (6th ed. 2009). Brandon testified on direct examination that he did not have a gun the night of the shooting because he had just been released from prison and he could not have guns. The fact that Brandon was in possession of a gun over three years later is not necessarily inconsistent with that testimony. We agree with the trial court and the prosecutor that, if Brandon had testified that he had never possessed a gun, or even that he had not possessed a gun since his release from prison, then he may have opened the door to being impeached with the pending charge against him. See,

13

e.g., <u>Willis v. State</u>, 449 So. 2d 1258, 1260-61 (Ala. Crim. App. 1984) (upholding impeachment of defendant with misdemeanor gun charge after he "denied ever having carried a gun or failing to register a gun"). But Brandon did not testify in that manner.

We also point out that any attempt to impeach Brandon by insinuating that he lied about not possessing a gun the night of the shooting would have called into question Peterson's own credibility and the credibility of defense witnesses Ca'Niyah and Dre'Mayah, because all three testified, consistent with Brandon's testimony, that Brandon did not have a gun the night of the shooting. Although Peterson argues that it was "critical to the defense" (Peterson's brief, p. 63) to impeach Brandon in order to call into question his testimony that he did not punch Peterson, given that the method by which Peterson sought to impeach Brandon would have also impeached Peterson's own testimony and that of his defense witnesses, we fail to see any harm in the trial court's precluding Peterson from doing so. See Rule 45, Ala. R. App. P.

Therefore, the trial court did not err in not allowing Peterson to cross-examine Brandon regarding his pending gun charge, and Peterson is entitled to no relief on this claim.

II.

Peterson also raises several issues regarding the trial court's jury instructions.

"'It has long been the law in Alabama that a trial court has broad discretion in formulating jury instructions, provided those instructions are accurate reflections of the law and facts of the case.'" Harbin v. State, 14 So. 3d 898, 902 (Ala. Crim. App. 2008) (quoting Culpepper v. State, 827 So. 2d 883, 885 (Ala. Crim. App. 2001)). "A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonable -- not a strained -- construction." Pressley v. State, 770 So. 2d 115, 139 (Ala. Crim. App. 1999), aff'd, 770 So. 2d 143 (Ala. 2000). "When reviewing a trial court's instructions, '"the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together."'" Williams v. State, 795 So. 2d 753, 780 (Ala. Crim. App. 1999), aff'd, 795 So. 2d 785 (Ala. 2001) (quoting Self v. State, 620 So. 2d 110, 113 (Ala. Crim. App. 1992), quoting in turn Porter v. State, 520 So. 2d 235, 237 (Ala. Crim. App. 1987)). Moreover, "every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which

15

are supported by any evidence, however, weak, insufficient, or doubtful in credibility." Chavers v. State, 361 So. 2d 1106, 1107 (Ala. 1978). "'The standard of review for jury instructions is abuse of discretion.'" Grant v. State, 324 So. 3d 887, 893 (Ala. Crim. App. 2020) (quoting Petersen v. State, 326 So. 3d 535, 609 (Ala. Crim. App. 2019)).

## A.

Peterson first contends that the trial court erred in instructing the jury that his defense of self-defense applied only to Brandon and not to Shaneia or Stefon. He argues that, under the doctrine of transferred intent, "self-defense may transfer to the unintended victim." (Peterson's brief, p. 27.) Because, he says, there was evidence supporting the theory that he accidentally shot Shaneia and Stefon when he was defending himself against Brandon, Peterson maintains that he was entitled to a self-defense instruction as to all three victims.[2] In the alternative with respect to Stefon, he argues that there was a reasonable theory of the

---

[2]Peterson recognizes that the doctrine of transferred intent does not apply to attempted murder. See Cockrell v. State, 890 So. 2d 174 (Ala. 2004). He argues, however, that because the trial court instructed the jury on assault as a lesser-included offense of the attempted-murder charge involving Stefon, and the doctrine of transferred intent does apply to the offense of assault, he was entitled to an instruction on self-defense with respect to the lesser-included offense of assault involving Stefon.

16

evidence that he was acting intentionally when he shot Stefon, but that he did so in self-defense because Stefon was standing next to Brandon when Brandon hit him, and he feared for his life not just from Brandon but also from Stefon. Peterson also takes issue with the trial court's giving State's requested jury instruction no. 14, which reads:

> "For self-defense to apply, the injured and/or deceased party must have been the party against whom the Defendant was defending himself. If the injured and/or deceased parties are not the intended target(s) or aggressor(s), and you do not find that their injuries or death was purely accidental, self-defense does not apply."

(C. 34.) He argues that this instruction was an inaccurate statement of the law, that it was confusing and misleading, and that it contradicted the trial court's instruction that his defense of self-defense applied only to Brandon, leaving the jury "to do mental gymnastics to decide if they could consider self-defense with regard to Shaneia." (Peterson's brief, p. 29.) According to Peterson, even though the jury rejected his claim of self-defense as to Brandon, the trial court's failure to instruct the jury on self-defense as to all three victims was not harmless because the State's

17

requested jury instruction no. 14 "was so confusing [as] to infect Peterson's substantial rights and his trial." (Peterson's brief, p. 32.)[3]

The record reflects that the trial court initially instructed the jury on self-defense in accordance with the Alabama Pattern Jury Instructions, Criminal Proceedings, Defenses, Justification and Excuse, Self-Defense (Deadly Physical Force) (adopted October 17, 2014) (found at https://judicial.alabama.gov/docs/library/docs/13A-3-23.pdf on the date this opinion was released) as follows:

"One of the issues in this case is the issue of self-defense. The law in Alabama states that a person may use deadly physical force and is legally presumed to be justified in using deadly physical force in self-defense or in the defense of another person if the person reasonably believes that another

---

[3]We reject the State's argument that this issue was not properly preserved for review. Although the State is correct that Peterson did not state grounds when he formally objected to State's requested instruction no. 14, that instruction was submitted at the request of the trial court after a lengthy discussion regarding whether self-defense applied to Brandon, Shaneia, and Stefon and, if so, in what manner, with the prosecutor specifically relying on Gettings v. State, 32 Ala. App. 644, 647, 29 So. 2d 677, 680 (Ala. Crim. App. 1947), which we discuss below. The instruction was directly related to that discussion, and Peterson was clear during the discussion that he believed he was entitled to a self-defense instruction as to all three victims. "The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury." Ex parte Works, 640 So. 2d 1056, 1058 (Ala. 1994). The trial court was on notice of the error alleged by Peterson.

person is using or about to use unlawfully deadly -- unlawful physical force. I'm going to re-read that to you again.

"A person may use deadly physical force and is legally presumed to be justified in using deadly physical force in self-defense if the person reasonably believes that another person is using or about to use unlawful deadly physical force.

"The defendant does not have a duty to retreat and has the right to stand his or her ground so long as he or she is justified in using deadly physical force and not engaged in an illegal activity and is in a place where he or she has a right to be located.

"The defendant is not justified in using deadly physical force if, 1, with intent to cause physical injury or death to another person, he or she provoked the use of unlawful physical force by such other person.

"Or 2, he or she was the initial aggressor, except that his or her use of physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his or her intent to do so. But the latter person, nevertheless, continues or threatens the use of unlawful physical force.

"The defendant does not have the burden of proving that he or she acted in self-defense.

"To the contrary, once self-defense becomes an issue, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

"Deadly physical force is force that under the circumstances in which it is used is readily capable of causing death or serious physical injury.

> "A reasonable belief is a belief formed in reliance upon reasonable appearances. It is a belief not formed recklessly or negligently. The test of reasonableness is not whether the defendant was correct in his or her belief, but whether the belief was reasonable under the circumstance existing at the time."

(R. 637-39.) Immediately following this instruction, the court stated:

> "Now this instruction concerning self-defense is for the case involving Brandon Dozier. So that is for CC-2020-674. Self-defense -- the self-defense instruction applies when you are considering the case against Brandon Dozier. That is CC-2020-674. On the verdict form I will make a notation -- I will put the victim's name on it so that you will know when you are deliberating, okay?"

(R. 639.)

After instructing the jury on the elements of intentional murder, attempted murder, and first-degree assault, the court then gave several of the parties' requested instructions relating to self-defense as follows:

> "I charge you, ladies and gentlemen, there are times when exceptional and unusual circumstances may justify the use of a deadly weapon against an unarmed man, such as a great disparity between the parties and the matter of physical power or other peculiar conditions.
>
> "....
>
> "The burden shifts when I am -- in terms of self-defense. The self-defense instruction. It states that the defendant does not have the burden of proving that he acted in self-defense, but to the contrary, once self-defense becomes an issue, the State has the burden of proving beyond a reasonable doubt

20

that the defendant did not act in self-defense. So this piece of the law goes with that statement. This burden shift to the State does not place the obligation on the State to present additional evidence. The State is justified in relying on the evidence previously presented to prove beyond a reasonable doubt that the deadly force was not justified.

"In order to justify the use of deadly force in self-defense the person must have an honest and reasonable belief that they are in imminent danger of deadly force.

"An unreasonable belief, no matter how honest, cannot justify the use of deadly force.

"A threat, in and of itself, is insufficient to justify self-defense. This remains true even if the threat could possibly be carried out.

"When a defendant claims self-defense, that claim is an admission that the conduct is intentional.

"The accused's fear of an attack without an overt demonstration of hostility on the part of the person does not justify self-defense.

"The presence of a weapon does not justify self-defense on its own. Danger of imminent physical or deadly harm must be apparent and in the present.

"....

"An assault with the hand or fist does not, under normal, ordinarily circumstances -- okay. Let me re-read that because I missed some words there.

21

"An assault with the hand or fist does not, under ordinary circumstances, neither [sic] justify nor excuse the use of a deadly weapon.[4]

"A defendant is not justified in using self-defense against any assault. There must be a demonstration of hostility that puts the defendant in honest and reasonable fear of severe bodily harm or death.

"For self-defense to apply, the injured and/or deceased party must have been the party against whom the defendant was defending himself. If the injured and/or decedent parties are not the intended targets or the aggressors, and you do not find that their injuries or death was purely accidental, self-defense does not apply."

(R. 645-48.) During deliberations, the jury requested written instructions on intentional murder, attempted murder, and self-defense. The trial court declined the request, but re-instructed the jury on intentional murder, attempted murder, first-degree assault, and self-defense. Those instructions were virtually identical to its original instructions.

Section 13A-3-23, Ala. Code 1975, provides, in relevant part:

"(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or

_____

[4]The trial court read this instruction verbatim from the State's written request.

22

she reasonably believes to be necessary for the purpose. A person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense … if the person reasonable believes that another person is:

"(1) Using or about to use unlawful deadly physical force."

(Emphasis added.) In Ex parte Teal, 336 So. 3d 165, 169 (Ala. 2021), the Alabama Supreme Court explained that "[a]n individual may use deadly physical force on 'another person' in self-defense, but, under § 13A-3-23(a)(1), that other person must be one who the individual claiming to act in self-defense 'reasonably believes' is using, or is 'about to use' unlawful deadly physical force." (Emphasis added.) In other words, an individual is justified under the self-defense statute in using deadly physical force only against the person he reasonably believes is aggressing against him, but he is not justified in using deadly physical force against a person he does not reasonably believe is aggressing against him, such as an innocent bystander. As the prosecutor aptly noted during the charge conference: "Having a self-defense claim against [one] person doesn't give you permission to shoot everyone in the room." (R. 590.)

23

Of course, that does not mean that an individual is criminally liable when he or she justifiably uses force against an aggressor and <u>accidentally</u> injures or kills an innocent bystander. It has been said:

> "The decisions of our appellate courts are clear to the position that if a person, without legal excuse or justification, shoots at one individual and inadvertently kills another, he would be guilty of the same degree of unlawful homicide as if he had killed the object of his aim. It is also settled by the authorities that <u>if he was acting in self-defense and accidentally killed another he would be guilty of no crime</u>.
>
> "Therefore, … if the jury was convinced from the evidence beyond a reasonable doubt that the accused fired the shot that caused the death of the deceased, <u>guilt or innocence would be determinable on the inquiry, whether or not the defendant would have been justified and excusable in his act had he shot and killed … the person for whom his fire was intended</u>."

<u>Gettings v. State</u>, 32 Ala. App. 644, 647, 29 So. 2d 677, 680 (1947) (emphasis added). See also <u>Mathis v. State</u>, 497 So. 2d 231, 232 (Ala. Crim. App. 1986) ("'[T]he guilt of an accused who, intending to injure one person, accidentally injures another, is to be determined as if the accused had injured his intended victim. <u>Gilbert v. State</u>, 20 Ala. App. 28, 100 So. 566 [(1924)]; <u>Lewis v. State</u>, 22 Ala. App. 108, 113 So. 88 [(1927)].' <u>Bradberry v. State</u>, 37 Ala. App. 327, [330,] 67 So. 2d 561, 564 (1953). 'Not only is intent transferred, but also the degree of the crime and any

24

defenses that would be valid if the intended victim had been hit.' Prosser, Transferred Intent, 45 Tex. L. Rev. 650, 653 (1967).").

However, just as transferred intent is "'only a fiction, or a legal conclusion, to accomplish the desired result of liability,'" Carter v. State, 843 So. 2d 812, 816 (Ala. 2002) (quoting Commentary to § 13A-6-2, Ala. Code 1975), transferred self-defense is a fictional construct designed to limit liability for accidental harm to someone other than the person against whom an individual justifiably uses force. It is because the harm to the bystander was accidental, not because the individual was justified in using force against the bystander, that the individual's liability is limited. In other words, the transfer of self-defense is applicable only in terms of liability, not in terms of the underlying justification for the use of force. Because the defense of self-defense applies only to the person the defendant "'reasonably believes' is using, or is 'about to use' unlawful deadly physical force," Ex parte Teal, 336 So. 3d at 169, and because the guilt or innocence of a defendant for accidental harm to an unintended victim is determined by whether the defendant was justified in using force against the intended victim, see Gettings, supra, a defendant is not entitled to a jury instruction on self-defense as to an unintended victim

25

under a theory of transferred intent. That is not to say that a defendant would not be entitled to a jury instruction in line with the holding in Gettings, supra, i.e., that the defendant's guilt or innocence for accidental harm to an unintended victim is to be determined by whether or not the defendant was justified in using force against the intended victim, which appears to have been the intent behind State's requested jury instruction no. 14, however inartfully worded that instruction was.

We note that Peterson's reliance on Thornton v. State, [Ms. CR-19-0506, July 8, 2022] ___ So. 3d ___ (Ala. Crim. App. 2022), in support of his argument, is misplaced. Peterson quotes the following excerpt from Thornton:

> "[A]lthough a person who acts accidentally and accidentally kills another person cannot claim that they acted in self-defense, see § 13A-3-23(a), and Lovell [v. State], [521 So. 2d 1346 (Ala. Crim. App. 1987),] a person like Thornton who acts intentionally, harbors a 'reasonable belief' that the act of self-defense is necessary under the circumstances, and accidentally causes the death of another person is entitled to an instruction under Alabama's self-defense statute. To hold that self-defense is available to only those people who intend that a certain result occur would add a requirement to § 13A-3-23(a) that simply is not there. This Court '"is not at liberty to rewrite statutes or to substitute its judgment for that of the Legislature."' Slagle v. Ross, 125 So. 3d 117, 126 (Ala. 2012) (quoting Ex parte Carlton, 867 So. 2d 332, 338 (Ala. 2003))."

26

___ So. 3d at ___ (footnote omitted). The above excerpt must be read in context of the facts of that case. The defendant in Thornton claimed that the victim threatened her with scissors, choked her, and raped her. While he was raping her, the defendant said, she kicked the victim, and he fell on the scissors. The defendant denied intentionally killing the victim. The defendant in Thornton did not injure or kill an innocent bystander; she killed the aggressor, the person who she claimed was using deadly physical force against her. This Court, with two judges concurring, two judges concurring in the result, and one judge dissenting, held that the trial court had erred in not instructing the jury on self-defense because, even though the defendant denied intending to kill the victim, she admitted that her conduct in kicking the victim was intentional, and self-defense requires only an intentional act, not an intent to kill.[5] The above excerpt, in light of the facts of Thornton, stands only for the proposition that, on trial for killing an aggressor, a defendant who claims he or she acted in self-defense but lacked the intent to kill the

_____

[5]This Court ultimately concluded, however, that the error was harmless.

27

aggressor is entitled to a jury instruction on self-defense. Therefore, Thornton is inapposite here.

Peterson would have been entitled to a jury instruction on self-defense as to Shaneia and Stefon only if there was evidence indicating that he reasonably believed Shaneia and Stefon were using or about to use unlawful deadly physical force against him. Viewing the evidence in the light most favorable to Peterson, as we must, see Ex parte McGriff, 908 So. 2d 1024, 1036 (Ala. 2004), we conclude that there was no evidence presented at trial from which the jury could have concluded that Peterson reasonably believed that Shaneia was using or about to use deadly physical force against him. With respect to Stefon, there was some evidence -- Stefon's alleged hostile actions towards Ca'Niyah and Dre'Mayah, his location next to Brandon when Brandon hit Peterson, Peterson's testimony that he thought "they fixing to try to kill me" (R. 563.)[6] -- indicating that Peterson reasonably believed that Stefon, as well

_____

[6]See Ex parte Teal, 336 So. 3d at 171 (holding that the defendant's testimony, including that he was trying "'to get them off of me'" when he fired his gun in a "general upward direction," missing the man who was holding him down and choking him but hitting the man's friend who was standing nearby, indicated that the defendant reasonably believed that the man's friend "was about to use, or to join [the man] in the use of, unlawful deadly physical force").

28

as Brandon, was about to use deadly physical force against him. However, that does not end our analysis.

At trial, Peterson asserted that he had acted in self-defense when he shot Brandon, but he steadfastly denied shooting either Stefon or Shaneia. Peterson denied that he "hit" Stefon when he shot at Brandon (R. 571.) and stated that he "didn't shoot Shaneia" (R. 578.); he denied that he "accidentally shot" anyone when he was shooting at Brandon (R. 572, 577-78.) and testified that he was not the only person firing a gun that night (R. 572.) and that he believed Clint shot Stefon. (R. 573-74.) Although defense counsel attempted to broaden Peterson's testimony in this regard by asking him "if someone else was shot or injured by your action, then it was totally unintended" (R. 579.), to which Peterson replied in the affirmative, that specific testimony, given the phrasing of the question and Peterson's steadfast denials that he had not shot either Stefon or Shaneia, indicates only that Peterson did not intend for Stefon or Shaneia to be shot by someone as a result of his shooting Brandon. Simply put, when his testimony is read as a whole, it is clear that Peterson's defense at trial was that he shot Brandon in self-defense, that he did not shoot either Stefon or Shaneia, and that if his action in

29

shooting Brandon (and only Brandon) caused someone else to shoot Stefon and Shaneia, it was unintended on his part. Therefore, even though there was some evidence to support an instruction on self-defense as to Stefon, such an instruction would have been inconsistent with Peterson's defense that he did not shoot Stefon, but that Clint shot Stefon. "A trial court does not err in refusing to give an instruction that is inconsistent with the defense strategy." Harbin v. State, 14 So. 3d 898, 911 (Ala. Crim. App. 2008).

Finally, although State's requested jury instruction no. 14 was not the epitome of clarity, based on Ex parte Teal and Gettings, supra, it was, in fact, an accurate statement of the law.

For these reasons, Peterson is entitled to no relief on this claim.

## B.

Peterson next contends that the trial court erred in refusing to instruct the jury on reckless manslaughter and criminally negligent homicide as lesser-included offenses of the murder charge. He argues that the evidence presented a reasonable theory that his intentional conduct in shooting Brandon in self-defense was simultaneously either reckless or negligent as to Shaneia. According to Peterson, "a claim of

self-defense against one individual ([Brandon]) does not foreclose the argument that an accused acted recklessly [or negligently] with regard to a different individual (Shaneia)." (Peterson's brief, p. 40.)

As noted previously, Peterson steadfastly denied shooting Shaneia, and "[a] trial court does not err in refusing to give an instruction that is inconsistent with the defense strategy." Harbin v. State, 14 So. 3d 898, 911 (Ala. Crim. App. 2008). "'Where the instructions would have conflicted with defense strategy, there is no error in the trial court's failure to give the instructions.'" McWhorter v. State, 781 So. 2d 257, 269 (Ala. Crim. App. 1999), aff'd, 781 So. 2d 330 (Ala. 2000) (quoting Bush v. State, 695 So. 2d 70, 113 (Ala. Crim. App. 1995)). Moreover, even if Peterson's defense had been that he shot Shaneia while defending himself against Brandon, there was no reasonable theory of the evidence that would have supported instructions on either reckless manslaughter or criminally negligent homicide. Peterson asserted that he acted in self-defense when he shot Brandon and, under the evidence presented at trial, Peterson either justifiably defended himself against Brandon and, in the process of doing so, accidentally killed Shaneia, or he specifically targeted Shaneia, as Yvonne and Robert testified. There was no evidence

presented, by either the State or the defense, indicating that Peterson intentionally shot Brandon in self-defense but then recklessly or negligently shot Shaneia. The shootings of all three victims were part of the same conduct -- Peterson firing his gun -- and the same conduct cannot be both intentional and reckless or negligent.

Therefore, Peterson is entitled to no relief on this claim.

C.

Peterson next contends that the trial court erred in giving State's requested jury instructions no. 7 and 13 because, he says, they inaccurately stated the law by adding requirements to the defense of self-defense that are not in the self-defense statute. Requested jury instruction no. 7, reads:

> "The accused's fear of attack, without an overt demonstration
> of hostility on the part of the deceased person, does not justify
> self-defense."

(C. 685.) Peterson argues that this instruction added "unnecessary and confusing language about overt hostile action" that "suggests that something more than a reasonable belief of imminent harm is required for self-defense to apply" and that it did not include a definition of "overt

32

demonstration of hostility." (Peterson's brief, pp. 48-49.) Requested jury instruction no. 13 reads:

> "A defendant is not justified in using self-defense against any assault. There must be a demonstration of hostility that puts the defendant in honest and reasonable fear of severe bodily harm or death."

(C. 34.) Peterson argues that this instruction "unnecessarily confused the law" by leading jurors to believe that they could not "consider self-defense against a fear of an assault." (Peterson's brief, pp. 51-52.) The State argues that Peterson failed to preserve these issues for appellate review. We agree with the State.

During the charge conference, the trial court and the parties discussed each of the State's written requested instructions. With respect to instruction no. 7, the following occurred:

> "THE COURT: … Number 7, the accused's fear of an attack, without an overt demonstration of hostility on the part of the deceased person, does not justify self-defense.
>
> "The accused's fear of an attack without an overt demonstration of hostility on the part of the deceased person --
>
> "[Prosecutor]: We can take out 'deceased' and put Brandon Dozier.
>
> "[Defense counsel]: That's number 6?

33

"THE COURT: Number 7.

"[Defense counsel]: Number 7? Okay.

"THE COURT: Let me come back to number 7.

"[Defense counsel]: I object to that one.

"THE COURT: You object to number 7?

"[Defense counsel]: Yes.

"THE COURT: Okay. I'll come back to 7.

"....

"THE COURT: ... I'm going back to number 7 --

"[Prosecutor]: Your Honor, I've had this for several years now. If you take out deceased or the act and replace it with acting person, but just fear of an attack does not --

"THE COURT: I will give number 7 over the defendant's objection, but your objection is noted for the record."

(R. 595-98.) The Court addressed instruction no. 13 simultaneously with instruction no. 14 as follows:

"THE COURT: Okay. State's requested jury charge number 13 states: 'a defendant is not justified in using self-defense against any assault. There must be a demonstration of hostility that puts the defendant in honest and reasonable fear of severe bodily harm or death,' Lemley v. State[, 599 So. 2d 64 (Ala. Crim. App. 1992)]. I will give that one. That is a correct statement of the law.

"And State's requested charge number 14 … I will give number 14. Number 13 and 14.

"[Defense counsel]: We object to both of them being given.

"THE COURT: All right. Your objection is noted for the record."

(R. 615-16.) At the conclusion of the court's oral charge, when asked if there were any exceptions, Peterson's counsel stated: "Other than the ones I made initially, no, Your Honor." (R. 650.).

"No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects <u>and the grounds of the objection</u>." Rule 21.3, Ala. R. Crim. P. (Emphasis added.) Peterson stated no grounds for his objections to State's requested jury instructions no. 7 and no. 13. And unlike State's requested instruction no. 14, where a discussion was had regarding the applicability of self-defense to the three victims and Peterson made his position on the issue clear, there was no discussion regarding the specific elements of self-defense or the level of hostility required for self-defense so as to put the trial court on notice of any

35

alleged defect in the requested instructions. Because Peterson failed to state grounds in support of his objections to State's requested jury instructions no. 7 and no. 13, this issue was not properly preserved for review.

D.

Finally, Peterson contends that the trial court erred in giving the State's requested jury instruction on flight, requested instruction no. 9, which reads:

> "In this case, you heard evidence of the defendant's flight from the alleged scene. You can use this evidence to infer the defendant's consciousness of guilt. However, you are not required to do so."

(C. 686.) Peterson argues that this instruction was misleading and an incomplete statement of the law because, he says, it did not "advise the jury that there may be other reasons to consider for the flight" and it failed to follow the pattern instruction on flight. (Peterson's brief, p. 56.)

During the charge conference, the following occurred:

> "THE COURT: ... Number 9, in this case, you have heard of evidence of the defendant's flight from the alleged scene. You can use this evidence to infer the defendant's consciousness of guilt. However, you are not required to do so.
>
> "What's your position on number 9, [Defense counsel]?

36

"[Defense counsel]: Well, by that statement that, however, you're not required to do so.

"THE COURT: Okay. I'm going to give requested charge number 9."

(R. 596.) Although Peterson asserts in his brief to this Court that he objected to the instruction on p. 596 of the transcript, as the above-quoted portion of the transcript reveals, he lodged no objection but appeared to simply reiterate a portion of the charge, i.e., "however, you're not required to do so." And he certainly did not present to the trial court the argument he now makes on appeal. See Rule 21.3, Ala. R. Crim. P. Therefore, this issue was not properly preserved for review.

## III.

Based on the foregoing, the judgment of the trial court is affirmed.

AFFIRMED.

Windom, P.J., and McCool, Cole, and Minor, JJ., concur.